J-A15041-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| INVOLUNTARY TERMINATION OF PARENTAL RIGHTS: K.A.R.Z., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.Z., FATHER | : : : : : | |
| | : | No. 103 MDA 2025 |

Appeal from the Decree Entered December 20, 2024
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s):  2023-916

BEFORE:   BOWES, J., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:        **FILED: AUGUST 11, 2025**

R.Z. ("Father") appeals from the April 29, 2024 decree that involuntarily terminated his parental rights to his son, K.A.R.Z. ("Child"), born in September of 2020.[1][2]  After review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] By the same decree, the court also involuntarily terminated the parental rights of B.Z. ("Mother," collectively with Father, "Parents"), which Mother separately appealed, and this Court affirmed.  **See In re K.Z.**, 331 A.3d 608 (Pa.Super. 2024) (unpublished memorandum).

[2] Parents also share two children born after Child's removal, neither of whom are subjects of this appeal.  Specifically, C.M. was born in April 2022, and B.M. in July 2023.  **See** N.T., 1/12/24, at 26-27, 42.  While C.M. remained in Parents' custody at the time of the subject hearings, B.M. was removed from their custody and resides in the same foster home as Child.  **See id.** at 96, 98; N.T., 4/2/24, at 8.  Mother also has two older children, who, as best we can discern, do not reside with her full-time but attend some of Mother's visitations with Child.  **See** N.T., 1/12/24, at 118; N.T., 4/2/24, at 63.

The orphans' court aptly set forth the facts and procedural history, in relevant part, as follows:

Lebanon County Children & Youth Services (hereinafter "CYS" [or "the Agency"]) became involved with the family on October 8, 2020, following a referral expressing concerns that there was a lack of parenting skills as well as [Child's] failure to thrive, lack of gaining weight, and several weight changes. CYS received a second referral on October 16, 2020, again addressing concerns of [Child's] weight and not seeing the doctor since September 28, 2020. On October 18, 2020, CYS received a third referral that was made subsequent to Child being hospitalized on October 16, 2020, for failure to thrive. While Child was hospitalized, there were concerns regarding the parents' missing feedings for Child. The referral made on October 18, 2020, referenced concerns for [Child's] failure to thrive, lack of appropriate parenting skills, and concerns for Mother's mental health.

Upon Child's discharge from the hospital, a safety plan was put in place on October 22, 2020. JusticeWorks Family of Services ("JusticeWorks") began working with the family on October 28, 2020, to help Parents stay on a feeding schedule and make sure they were following the safety plan. During JusticeWorks' involvement with the family from October 28, 2020, until January of 2021, there were concerns regarding [Child's] nutrition, lack of appropriate feeding, conflict in Parents' relationship, dirty home conditions, and Mother being left alone with Child for extended periods of time. There were additional concerns that Parents were unreceptive to feedback from Child's doctors, CYS, and JusticeWorks. It was noted that Parents were argumentative and would deflect responsibility onto others.

On December 14, 2020, Child was hospitalized again due to not gaining a sufficient amount of weight. At that time, the hospital recommended that Child be admitted, but Father was adamant that Child not stay overnight. It was only once CYS informed Father that they would request emergency custody of [Child] if he went against medical advice that Father allowed the hospital to admit Child. During Child's hospitalization, Parents needed to be woken up and prompted to feed Child. On December 19, 2020, CYS received a Child Protective Services referral regarding [Child's] failure to thrive. This was the fourth referral CYS

- 2 -

received regarding the family. Parents continued to deny and deflect responsibility.

Due to ongoing concerns, on December 20, 2020, guardianship was turned over to an individual by the name of [T.S.]. During the time Child was under the guardianship of [T.S.], [P]arents visited Child; however, they were [not consistent]. Child remained in the care of [T.S.] until March 19, 2021, when guardianship was signed over to [A.H.].

On February 9, 2021, the child abuse investigation concluded, and [Parents] were both indicated as perpetrators of abuse for failure to provide nutrition and hydration to Child. On May 5, 2022, [Parents] were charged with one count of endangering welfare of child [("EWOC")], a felony of the second degree, and one count of conspiracy [EWOC], also a felony of the second degree. [Parents] were placed into the Accelerated Rehabilitative Disposition ("ARD") program.[3] Father was later terminated from the ARD program for use of methamphetamines and possession of methamphetamines.

Due to Parents' lack of significant progress on their goals listed on the family service plan, lack of cooperation with CYS and JusticeWorks, refusal to acknowledge responsibility, ongoing concerns for the condition of the home, Mother's mental health, and [Parents'] unstable relationship, CYS filed a dependency petition on June 22, 2021. Following a hearing on June 28, 2021, the court found Child dependent on the grounds that Child was without proper parental care or control pursuant to 24 Pa.C.S.A. § 6302. At that time, legal custody of Child was granted to CYS, and physical custody was granted to [A.H.].

In April of 2022, JusticeWorks closed its file unsuccessfully due to Parents' lack of cooperation. Child remained with [A.H.] until August 4, 2022, when the physical custody was transferred to CYS

_____

[3] Our Supreme Court has explained that "ARD, accelerated rehabilitative disposition, is a pretrial disposition of certain cases, in which the attorney for the Commonwealth agrees to suspend prosecution for an agreed upon period of time in exchange for the defendant's successful participation in a rehabilitation program, the content of which is to be determined by the court and applicable statutes." **Commonwealth v. Lutz**, 508 Pa. 297, 303, 495 A.2d 928, 931 (1985).

- 3 -

and Child was placed in a foster home. Child has remained in the same CYS approved foster home since his placement on August 4, 2022. [Following a two-to-three-month gap due to Parents' unresponsiveness, visitation, which had transitioned to unsupervised under T.H., resumed.[4]]

Orphans' Court Opinion ("O.C.O."), 6/19/24, at 4-6 (cleaned up) (citations omitted).

Thereafter, the court established Child's permanency goal as reunification with a concurrent goal of adoption. In furtherance of reunification, the Agency created a permanency plan with goals for Father focused on, *inter alia*, housing, employment, substance abuse, and mental health. **See** Petition for Involuntary Termination of Parental Rights, 11/30/23, Exhibits J-P. The court held permanency review hearings at regular intervals. **See** N.T., 1/12/24, at 38-40, 43-44.

In July 2023, Parents were evicted from their home and moved to a hotel. **See id.** at 42, 63, 65-66; N.T., 4/2/24, at 61. Shortly thereafter, in August 2023, they began residing in the home of Mother's sister, which the Agency deemed unstable due to there being no lease agreement, as well as inappropriate for Child because of overcrowding due to the total number of children residing in the home. **See** N.T., 1/12/24, at 43, 64-65, 91-92, 104, 109-11; N.T., 4/2/24, at 11-13; 61. Further, since November 2021, Father

_____

[4] This included one-hour in-person supervised visits, which increased to two hours, as well as two Zoom visits per week. **See** N.T., 1/12/24, at 57, 101.

provided the Agency with two paystubs, and thus, there was no evidence that he was steadily employed. *See* N.T., 1/12/24, at 89-90. As a result, the Agency referred Father to Diakon Family Preservation and Reunification Services (hereinafter "Diakon") in or around October or November 2023 for assistance, *inter alia*, with housing and employment. *See id.* at 47, 95-96, 115, 120; N.T., 4/2/24, at 6, 26.

Moreover, Father tested positive for methamphetamines in December 2021 and November 2022. *See* N.T., 1/12/24, at 39, 85. He was criminally charged with possession of methamphetamines in October 2022, which arose from an incident in June 2022. These charges ultimately resulted in his removal from the ARD program in September 2023.[5] *See id.* at 30, 34, 85-86; Agency Exhibits 4, 6-9. Nonetheless, Father did not acknowledge his need for drug and alcohol treatment. *See* N.T., 1/12/24, at 37-38, 85-88. Father also failed to provide documentation showing that he completed a mental health evaluation. *See id.* at 31-32, 80-84.

Notwithstanding, Parents' visitation with Child eventually progressed to weekly unsupervised visitation for three hours in June 2023. It then expanded from three hours to six hours in August 2023. *See* N.T., 1/12/24, at 56-58, 94, 98; N.T., 4/2/24, at 36-39, 55. Child additionally participated in Parents'

---

[5] These charges, along with the EWOC charges against Father, remained pending during the subject hearings. *See* Agency Exhibit 4, 9. Father testified that he intended to plead guilty to the drug charges and to proceed to trial regarding the EWOC charges. *See* N.T., 4/2/24, at 110-13.

weekly two-hour supervised visits with his sibling, B.M., with whom he is placed. *See* N.T., 1/12/24, at 58.

On November 29, 2023, the Agency filed a petition for the involuntary termination of Parents' parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The orphans' court conducted evidentiary hearings on January 12, 2024, April 2, 2024, and April 29, 2024. Parents were present and represented by counsel. Child, then over three years old, was represented by a guardian *ad litem* and separate legal counsel.[6]

The Agency presented the testimony of its case supervisor, Michele Curry, and Jacqueline Kissel, the family's current caseworker. Additionally, Parents testified on their own behalf. Father also proffered the testimony of Elizabeth Goodman, the caseworker at Diakon.

By decree issued on April 29, 2024, the orphans' court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). On May 23, 2024, Father filed a notice of appeal erroneously at the Child's dependency docket. This Court quashed that appeal and directed him to file in the orphans' court a petition to appeal *nunc pro tunc* from the termination decree. Father complied, and, after the court

---

[6] As the orphans' court appointed separate counsel to represent Child's legal interests, the court complied with 23 Pa.C.S.A. § 2313(a), as interpreted by the High Court. *See In re Adoption of L.B.M.*, 639 Pa. 428, 441-42, 161 A.3d 172, 180 (2017) (footnote omitted).

granted his request, he timely filed this appeal *nunc pro tunc* on January 5, 2025. Father concurrently filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[7] The orphans' court filed a responsive opinion pursuant to Pa.R.A.P. 1925(a) on June 19, 2024, which it amended on June 30, 2024.

On appeal, Father raises the following issues for our review:

> 1. Did the [orphans' court] err in granting the petition for involuntary termination of parental rights where [CYS] failed to meet its burden pursuant to 23 Pa.C.S.A. § 2511(a)(1)?
>
> 2. Did the [orphans' court] err in granting the petition for involuntary termination of parental rights where [CYS] failed to meet its burden pursuant to 23 Pa.C.S.A. § 2511(a)(2)?
>
> 3. Did the [orphans' court] err in granting the petition for involuntary termination of parental rights where [CYS] failed to meet its burden pursuant to 23 Pa.C.S.A. § 2511(a)(5)?
>
> 4. Did the [orphans' court] err in granting the petition for involuntary termination of parental rights where [CYS] failed to meet its burden pursuant to 23 Pa.C.S.A. § 2511(a)(8)?
>
> 5. Did the [orphans' court] err in granting the petition for involuntary termination of parental rights without properly considering the bond that exists between Child and [Father]?
>
> 6. Did the [orphans' court] err in granting the petition for involuntary termination of parental rights without property

---

[7] In the order quashing Father's appeal at 1164 MDA 2024, this Court directed Father to file an appeal *nunc pro tunc* within five days of the orphans' court order granting his request. The court granted Father's request to appeal *nunc pro tunc* on December 20, 2024, and directed him to do so within thirty days from the date of that order. We note the inconsistencies in the aforesaid orders regarding the timeframe in which Father was required to file an appeal *nunc pro tunc*. We deem Father's appeal timely inasmuch as he filed it within thirty days of the December 20, 2024 court order.

considering the bond that exists between Child and the child's siblings?

Father's Brief at 8-9 (cleaned up).

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa.Super. 2022) (internal citations

and quotation marks omitted).

- 8 -

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013); *see also* 23 Pa.C.S.A. § 2511(b). This Court need only agree with the trial court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Accordingly, we analyze the decree involuntarily terminating Father's parental rights to Child pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).[8]

To prove the applicability of Section 2511(a)(2), the party petitioning for termination must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re Adoption of A.H.***, 247 A.3d 439, 443 (Pa.Super. 2021) (citation omitted). Grounds for termination pursuant to Section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." ***Id.*** (citation omitted). We have long

---

[8] Given our disposition relative to Section 2511(a)(2), we need not review and make no conclusions as to the orphans' court's findings with respect to Section 2511(a)(1), (5), and (8). ***See B.L.W.***, 843 A.2d at 384; ***see also In re K.R.***, 200 A.3d 969, 979 (Pa.Super. 2018) (*en banc*) (observing this Court may proceed to a review of one subsection of Section 2511(a) "[w]ithout considering the orphans' court's determinations" under any other subsection). As such, we do not address Father's first, third, and fourth issues on appeal.

recognized that "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental duties." *Id.* (citation omitted).

Instantly, with respect to Section 2511(a)(2), the orphans' court reasoned, in part:

> Throughout the case, Parents never obtained stable housing; at the time of the last two hearings the family was living with Mother's sister. Drug use remained a concern in this case. Father has never been consistent with submitting to drug tests and did not refrain from using drugs. He tested positive for methamphetamines in December of 2021, November of 2022 and was charged with possession of methamphetamines in June of 2022. Father has denied needing treatment throughout the entirety of the case and even when he did undergo a drug and alcohol evaluation, he did not follow through with the recommendations. Mental health is also still a concern . . . . Steady employment and income was never achieved throughout this case. . . . Father testified that he was getting paid under the table for construction work but was having trouble finding more steady employment. Parents were provided with services through the case and yet little to no progress was made. JusticeWorks closed the case unsuccessfully due to Parents' lack of cooperation. Later, Diakon offered their services and also considered closing the case due to the lack of [] progression. Even with these services in place, Parents have failed to find permanency in housing, income, and employment during the entire pendency of this case. Throughout the entire case, Parents were never consistent with any goals except visitation. They were not always cooperative with CYS and at times were argumentative, dismissive, and found to be untruthful. Therefore, the court found that there was no indication that Parents will be able to remedy the issues leading to incapacity, neglect, or refusal within a reasonable time.

O.C.O., 6/19/24, at 15-17 (cleaned up).

On appeal, Father argues that the court abused its discretion in terminating his parental rights pursuant to Section 2511(a)(2) because he made "significant progress" with respect to his permanency goals. Father's

Brief at 30. Specifically, Father asserts that he participated in supervised visitation with Child, obtained employment, and executed a housing lease. Thus, Father argues that he was in "substantial" compliance with the permanency plan by August 2023, well before the commencement of the termination hearings. *Id.* at 30-31.

In so arguing, Father relies upon *In re I.J.*, 972 A.2d 5 (Pa.Super. 2009) in which the trial court denied the agency's petition to terminate the mother's parental rights to her child under Section 2511(a)(2) as the trial court found that the mother had made progress in remedying the conditions that led to the child's removal. *Id.* at 10. This Court affirmed the trial court's determination that the agency had failed to prove the third element of the Section 2511(a)(2) analysis – that the "conditions and the causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent." *Id.*

We conclude that *I.J.* is inapposite to this case where the record demonstrates that "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by" Father.[9] Indeed, the certified

_____

[9] We also note that this case can be distinguished from the decision in *I.J.* based on the procedural dispositions of each case. In *I.J.*, the agency appealed the trial court's determination that it had not met its burden to show grounds for termination. In contrast, in this case, Father is appealing the trial court's determination that the record contains sufficient grounds to warrant termination. In both cases, we affirmed the trial court's decision as our standard of review requires this Court "accept the trial court's factual findings

*(Footnote Continued Next Page)*

record fails to establish *any* improvement in Father's substance abuse, mental health, housing, or employment despite the services provided by JusticeWorks and Diakon. *See* N.T., 1/12/24, at 31-32, 80-84, 94-97; N.T., 4/2/24, at 54-55, 46-47.

Ms. Kissel, the caseworker for this family since July of 2023, testified:

Q. During the time that you have been involved, have Parents had stable housing?

A. No.

Q. During the time that you have been involved, have Parents had consistent or stable employment or income?

A. No.

Q. During your involvement, are there still concerns about [Father's] drug use?

A. Yes, we continue to drug test him.

Q. And he would have been kicked out of ARD in September of 2023 for methamphetamine use?

A. That is correct.

Q. You mentioned that the Diakon service has been in place for the last five months, has that service's involvement with the family resolved any of those concerns?

A. The drug use?

Q. Or the housing or the employment.

---

if supported by competent evidence of record—even if the record could likewise support an opposite result." *In re I.J.*, 972 A.2d at 11.

A. . . . Diakon . . . has provided a large amount of resources and time for [P]arents for housing issues and employment[,] and they have not progressed. So Diakon has asked as of yesterday if they can take their sessions down from two sessions a week to one session a week[] and have been asked to close the case because of [Parents] not progressing in the housing and employment.

Q. Is there any reason at this point to believe that additional time or services would get [Parents] to the point where they would be able to have consistent employment, income, or housing?

A. No.

N.T., 4/2/24, at 54-55; *see also* N.T., 1/12/24, at 94-97 (testimony by Ms. Curry, the caseworker supervisor, that Father has not remedied his housing and income instability or his substance abuse).

Father himself confirmed that he had not secured independent housing and that he and Mother were still residing with Mother's sister.[10] *See id.* at 99-101. Additionally, Father admitted that he had not engaged in any drug and alcohol treatment. *See id.* at 115-16, 120-21, 123-24, 128.

With respect to his goal of obtaining a mental health evaluation, Father ultimately did so in February 2023, but did not provide the evaluation to the Agency until the commencement of the subject proceedings in January 2024. Father was diagnosed with attention deficit hyperactivity disorder and anger management issues. The mental health evaluator recommended Father to

---

[10] To the extent that Mother subsequently testified that Parents ultimately executed a lease with her sister, this does not address the Agency's concern with the number of people in the home. *See* N.T., 1/12/24, at 64, 104; N.T., 4/29/24, at 6-7.

attend eight therapy sessions related to his diagnoses; however, the Agency had no documentation to establish that Father followed through with this recommendation. *See* N.T., 1/12/24, at 31-32, 80-84; N.T., 4/2/24, at 46.

Hence, we discern no abuse of discretion by the orphans' court in concluding that termination of Father's parental rights pursuant to Section 2511(a)(2) was warranted. The record amply supports the orphans' court's conclusion that Father's repeated and continued incapacity, abuse, neglect or refusal, namely his lack of progress with respect to substance abuse, mental health issues, housing, and employment, has caused Child to be without essential parental care, control or subsistence necessary for his physical and mental well-being. *See A.H.*, 247 A.3d at 443. Moreover, the record confirms that the causes of Father's incapacity, abuse, neglect or refusal cannot or will not be remedied.

Since the record supports the orphans' court's conclusion that adequate grounds for termination existed pursuant to at least one subsection of Section 2511(a), we now turn to a review of the court's findings pursuant to Section 2511(b), which gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

"The extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted). However, our Supreme Court has concluded that "only a necessary and beneficial" parental bond should be maintained. *K.T.*, 296 A.3d at 1009. A bond is considered to be "necessary and beneficial" if its severance would cause "extreme emotional consequences" or significant, irreparable harm. *Id.* at 1109-1110. This Court has recognized that,

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the

- 16 -

biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa.Super. 2008) (internal citations and quotation marks omitted).

Furthermore, "bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109. Therefore, it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents. *M.E.*, 283 A.3d at 839 (cleaned up).

In the case *sub judice*, Father argues that the orphans' court erred by not properly evaluating Child's bond and relationship with Father, as well as with his siblings. *See* Father's Brief at 37, 39. Father points to the lack of a bonding assessment as well as a therapeutic evaluation to ascertain the effect of the termination of his parental rights on Child. *See id.* at 37-39. Father's claim fails insofar as "[S]ection 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (citation omitted). As this Court explained, "[T]he court is not required to use expert

testimony. Social workers and caseworkers can offer evaluations as well." ***Id.*** (internal citations omitted).

While the orphans' court found the existence of a bond between Father and Child, the court "[did] not find that severing it would cause [C]hild harm." O.C.O., 6/19/24, at 17. Rather, the court found that Child shares a parent-child bond with his foster parents, with whom he has been residing since August 2022, and has been thriving in their care. ***See id.***

Upon review, the certified record supports the orphans' court's findings. Significantly, Child was three months old when removed from Father's care. ***See*** N.T., 1/12/24, at 97. Since the resumption of visitation following Child's placement, Father "regularly" attended weekly visitation with Child, which progressed from supervised to unsupervised in June 2023, and then expanded in August 2023, from three hours to six hours per week. ***See id.*** at 57-58, 92, 119-20; N.T., 4/2/24, at 37. Child additionally participated in Parents' weekly two-hour supervised visits with his sibling, B.M.[11] ***See*** N.T., 1/12/24, at 58; N.T., 4/2/24, at 36.

Ms. Curry observed that Child called Father, "dad," and would "seek [Parents] out" during visits. ***See*** N.T., 1/12/24, at 98, 113-14. However, Ms. Curry testified that Child "wasn't upset at all" when departing visits or when the visits were canceled. ***Id.*** at 94, 114; ***see also*** N.T., 4/2/24, at 39

_____

[11] Ms. Kissel testified that Parents cancelled 9 of 18 of the supervised visits. ***See*** N.T., 4/2/24, at 38.

(testimony of Ms. Kissel indicating no reaction from Child to cancellation of visitation).

In contrast, Ms. Kissel testified that Child is "very bonded" to his foster family and refers to his foster parents as "mom and dad." N.T., 4/2/24, at 56. She observed that, in the foster home, where Child resides with B.M., he "is more talkative. He runs around just like a boy. He is very involved with his foster siblings." *Id.* Ms. Kissel testified that Child has "excelled" in his pre-adoptive foster home where he resided for more than one and one-half years at the time of the conclusion of the proceedings. *Id.* at 35-36, 56.

Significantly, both Ms. Curry and Ms. Kissel attested that Child's foster family afford him the necessary permanency and stability. *See* N.T., 1/12/24, at 98; N.T., 4/2/24, at 56. Ms. Kissel testified that she "[did not] think it would have a huge impact" on Child to sever his relationship with Father. N.T., 4/2/24, at 55-56. As such, Ms. Curry and Ms. Kissel opined that termination of parental rights is in Child's best interests. *See* N.T., 1/12/24, at 97-98; N.T., 4/2/24, at 56-57.

With respect to Father's contention that the court abused its discretion in failing to consider Child's relationship with his biological siblings, this Court has explained as follows.

> While a decision ultimately may be made to place the [siblings] together in the future, the general rule disfavoring separation of siblings is not controlling as no absolute constitutional or statutory right to be raised with a sibling yet exists in our jurisprudence. The court, in any event, has discretion to place [siblings] according to the individual best interests of each child. The health,

safety, and welfare of each child supersede all other considerations.

*In re R.P.*, 956 A.2d 449, 458 (Pa.Super. 2008) (citations and quotation marks omitted).

In this case, we discern no abuse of discretion by the court in terminating Father's parental rights despite the possibility that it may sever one or more of his sibling relationships. Child resides with B.M. in his pre-adoptive placement, and Ms. Curry testified that Child's foster parents are "open" to him maintaining contact with other members of his biological family. N.T., 1/12/24, at 117. Thus, we are not persuaded by Father's argument.

Based on the foregoing, we discern no abuse of discretion by the orphans' court's conclusion that terminating Father's parental rights will serve Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). The record amply demonstrates that Father and Child do not share a necessary and beneficial relationship. *See K.T.*, 296 A.3d at 1109-10, 1113. Instead, Child shares a beneficial relationship with his foster parents. While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *Z.P.*, 994 A.2d at 1121 (citation omitted).

Accordingly, we affirm the decree involuntarily terminating Father's parental rights pursuant to Section 2511(a)(2) and (b).

Decree affirmed.

- 20 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 08/11/2025